# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

**No. 26-xxxxx**

**BLUESTAR OPERATIONS, LLC, a North Carolina Limited Liability Company**

*Petitioner,*

v.

**DRUG ENFORCEMENT ADMINISTRATION and TERRANCE C. COLE, in his official capacity as Administrator of the Drug Enforcement Administration and TODD BLANCHE, in his official capacity as acting United States Attorney General,**

*Respondents.*

---

## PETITION FOR REVIEW OF FINAL AGENCY ACTION

---

Pursuant to 21 U.S.C. § 877, 28 U.S.C. §§ 2341–2351, FED. R. APP. P. 15 and 19 and the Administrative Procedure Act, the Petitioner BLUESTAR OPERATIONS, LLC, ("Petitioner") hereby files this Petition for Review of Final Agency Action (the "Petition") humbly requesting this Court for review of final agency action undertaken by the Respondents Drug Enforcement Administration ("DEA"), DEA Administrator Terrance C. Cole ("Cole"), and acting U.S. Attorney General Todd Blanche ("Blanche"; collectively with the DEA and Cole, the

"Respondents"), in connection with the DEA's final rule and interpretive determination concerning hexahydrocannabinol ("HHC"), published in the Federal Register on or about May 4, 2026, entitled: "Specific Listing for Hexahydrocannabinol, a Currently Controlled Schedule I Substance" Docket No. DEA-1632, published at 91 FED. REG. 23913 (May 4, 2026) (the "Challenged Action"). A true and accurate digital photocopy of the Order in the Challenged Action is attached hereto as Exhibit 1. Further, this Petition is filed within thirty (30) days of notice of the Challenged Action, as required by 21 U.S.C. § 877, and is timely.

In support of the present Petition for Review of Final Agency Action, the Petitioner respectfully state the following:

### INTRODUCTION

1. This Petition challenges the DEA's unlawful interpretation and final agency action (the Challenged Action) treating hemp-derived hexahydrocannabinol (HHC) as a Schedule I controlled substance notwithstanding Congress's broad legalization of hemp cannabinoids through the Agriculture Improvement Act of 2018 (the "2018 Farm Bill"), as delegated to the DEA Administrator, reviewable under 21 U.S.C. § 877. Administrator Terrance C. Cole signed the Challenged Action on

2

April 22, 2026, and it was published in the Federal Register effective May 4, 2026.

2. Congress expressly defined "hemp" in the Agricultural Improvement Act of 2018, PUB. L.115-334 (2018 Farm Bill), as the Cannabis sativa L. plant "with a delta-9 tetrahydrocannabinol [THC] concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o(1). Therein, Congress also removed hemp and hemp-derived "derivatives," "extracts," "cannabinoids," and "isomers" from the statutory definition of marijuana under the Controlled Substances Act (the "CSA"), subject only to a delta-9 THC concentration threshold.

3. Congress intentionally employed expansive statutory language and did not prohibit cannabinoids subjected to ordinary extraction, refinement, conversion, hydrogenation, distillation, or similar manufacturing processes commonly utilized throughout the hemp industry.

4. Yet, in the Challenged Action, the DEA interprets hemp-derived HHC as a prohibited Schedule I tetrahydrocannabinol based largely upon its assertion that commercially produced HHC constitutes "synthetic THC."

5. The Challenged Action conflicts with the plain text, structure, and purpose of the 2018 Farm Bill and unlawfully inserts limitations Congress neither intended, nor enacted.

6. Through the Challenged Action, the DEA effectively expands federal criminal liability through administrative interpretation, unsupported by the statutory text.

7. The major questions doctrine applies when "(1) when the agency 'claims the power to resolve a matter of great political significance'; (2) when the agency 'seeks to regulate a significant portion of the American economy or require billions of dollars in spending by private persons or entities'; and (3) when an agency 'seeks to intrude into an area that is the particular domain of state law.'" *West Virginia v. EPA*, 597 U.S. 697, 743-44 (2022) (Gorsuch, J., concurring); *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 299 (4th Cir. 2023); *see also Biden v. Nebraska*, 600 U.S. 477, 502-06 (2023). Consistent with the major questions doctrine, Congress does not hide sweeping criminalization authority of an agency in vague definitional language; but rather, the DEA must point to "clear congressional authorization", rather than relying on vaguely worded statutory language. *West Virginia v. EPA*, 597

4

U.S. 697 (2022). Congress must speak clearly if it intended to criminalize broad categories of hemp-derived cannabinoids produced through ordinary commercial processing methods; absent language "speak[ing] plainly to the defendant's conduct, liberty must prevail." *Wooden v. United States*, 595 U.S. 360 (2022)(Gorsuch, J. concurring)(discussing *United States v. Mann*, 26 F. Cas. 1153 (No. 15,718)(CC NH 1812)).

8.    Courts owe no deference to agency interpretations expanding criminal liability. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). The legality of the DEA's interpretation presents a question of statutory construction for the judiciary. *See id.*

## JURISDICTION AND VENUE

9.    This Court has jurisdiction pursuant to 21 U.S.C. § 877, which authorizes judicial review of final determinations, findings, and conclusions of the DEA in the United States Courts of Appeals.

10.    Jurisdiction additionally exists pursuant to 28 U.S.C. §§ 2342 and 2344, and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

11.    Venue is proper in this Court under 21 U.S.C. § 877 because the Petitioner resides, conducts business, and suffers injury within the Fourth Circuit.

12. The Challenged Action and interpretive determination constitute final agency action because they represent the consummation of the DEA's decision-making process and impose immediate legal and practical consequences upon the Petitioner.

## PARTIES

13. The Petitioner, BLUESTAR OPERATIONS, LLC, a North Carolina limited liability company, and is engaged in the manufacture, processing, distribution, transportation, marketing, possession, and/or sale of hemp-derived cannabinoid products in North Carolina.

14. The Petitioner operates in reliance upon the protections established by the 2018 Farm Bill and applicable federal and state hemp laws.

15. The Respondent, DEA, is the federal agency charged with administration and enforcement of the CSA.

16. The Respondent, Terrance C. Cole, is named solely in his official capacity as Administrator of the DEA.

17. The Respondent, Todd Blanche, is named solely in his official capacity as acting Attorney General for the United States and is properly named as a the Respondent as the Challenged Action was undertaken

pursuant to authority delegated under the CSA by the Attorney General of the United States.

## STANDING

18. The Petitioner presently manufactures, markets, distributes, transports, possesses, and/or sells products containing hemp-derived HHC.

19. The Petitioner maintains inventory, customer relationships, commercial contracts, vendor agreements, and ongoing business operations involving HHC products.

20. The Challenged Action has already caused immediate and concrete harm to the Petitioner, including substantial compliance costs, business uncertainty, reputational harm, disruption of commercial relationships, and interference with ongoing operations, which harm is redressable by setting the Challenged Action aside.

21. The Petitioner has experienced and/or reasonably anticipates banking complications, merchant-processing disruptions, insurance complications, financing restrictions, cancellation of contracts, loss of business opportunities, and diminished goodwill arising directly from the challenged DEA action.

22. The Petitioner faces a credible and immediate threat of federal enforcement because the DEA has expressly interpreted HHC as a Schedule I controlled substance and formally codified that interpretation through the Challenged Action.

23. The Petitioner must presently choose between continuing lawful business operations in reliance upon the 2018 Farm Bill or ceasing operations to avoid criminal exposure, seizure, forfeiture, and other enforcement consequences.

24. The Petitioner's injuries are directly traceable to the Challenged Action and would be redressed through the relief requested herein.

### FACTUAL BACKGROUND

25. Prior to 2018, federal law broadly classified marijuana and tetrahydrocannabinols as Schedule I controlled substances.

26. In 2018, Congress enacted the 2018 Farm Bill and therein fundamentally altered the paradigm and tenor of federal cannabis regulation.

27. Congress removed hemp from the federal definition of marijuana and broadly legalized hemp and hemp-derived cannabinoids.

28. Congress defined hemp to include "all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers" containing not more than 0.3 percent delta-9 THC on a dry-weight basis.

29. Congress intentionally employed broad and inclusive statutory language. Terms such as "derivatives," "extracts," "cannabinoids," and "isomers" inherently contemplate transformation, refinement, extraction, processing, and conversion.

30. Modern hemp production routinely involves extraction, isolation, refinement, conversion, hydrogenation, distillation, and similar manufacturing processes necessary to create commercially usable cannabinoid products.

31. Congress enacted the 2018 Farm Bill against the backdrop of an existing hemp-processing industry and understood that cannabinoid production commonly involves post-extraction processing and refinement.

32. Despite this understanding, Congress did not prohibit converted cannabinoids, hydrogenated cannabinoids, or cannabinoids subjected to ordinary commercial processing techniques.

9

33. HHC is a cannabinoid that may be derived from lawful hemp material and is commonly produced using hemp-derived cannabinoid inputs.

34. The CSA does not clearly define "synthetic" in a manner encompassing all converted hemp cannabinoids. Nor does the 2018 Farm Bill distinguish between cannabinoids directly extracted from hemp and cannabinoids produced through ordinary refinement or conversion of lawful hemp-derived material.

35. The DEA nevertheless interprets commercially produced HHC as a prohibited synthetic tetrahydrocannabinol.

36. The DEA recently issued a final rule (the Challenged Action) specifically listing HHC and assigning it a separate DEA drug code while asserting that HHC was already controlled within the broader tetrahydrocannabinols category.

37. The Challenged Action improperly narrows Congress's legalization of hemp cannabinoids by administratively inserting restrictions Congress did not enact.

38. The DEA's interpretation additionally renders substantial portions of the 2018 Farm Bill's language meaningless because many

10

commercially viable cannabinoids necessarily involve extraction, refinement, or conversion processes.

39. Available scientific literature further suggests that HHC possesses pharmacological and chemical distinctions from delta-9 THC, including differing receptor activity, differing psychoactive intensity, and differing abuse-potential characteristics.

40. Existing evidence does not establish that HHC presents the same abuse potential, dependence liability, or public-health risks historically associated with Schedule I narcotics.

41. Upon information and belief, the DEA failed to adequately analyze HHC's distinct pharmacological characteristics, scientific profile, and industry reliance interests prior to adopting the challenged interpretation.

## GROUNDS FOR RELIEF

### A. THE CHALLENGED ACTION CONFLICTS WITH THE PLAIN TEXT OF THE 2018 FARM BILL.

42. Congress expressly legalized hemp and hemp-derived "derivatives," "extracts," "cannabinoids," "isomers," "acids," "salts," and "salts of isomers," provided that such substances contain not more than 0.3 percent delta-9 tetrahydrocannabinol on a dry-weight basis.

11

43. The 2018 Farm Bill neither excluded HHC nor placed a quantity threshold on it.

44. The statute does not prohibit cannabinoids subjected to ordinary extraction, refinement, conversion, hydrogenation, distillation, or similar commercial manufacturing processes.

45. The DEA's interpretation of the 2018 Farm Bill in the Challenged Action improperly inserts additional limitations Congress did not enact.

46. By construing hemp-derived HHC as a Schedule I controlled substance notwithstanding Congress's broad legalization of hemp cannabinoids, the DEA's interpretation conflicts with the plain text, structure, and purpose of the 2018 Farm Bill.

47. The Fourth Circuit has already recognized the force of this statutory distinction in the context of hemp-derived cannabinoids. In *Anderson v. Diamondback Investment Group, LLC*, 117 F.4th 165 (4th Cir. 2024), this Court considered whether products containing hemp-derived cannabinoids, including Delta-8, Delta-10, THC-O, and HHC, could qualify as lawful hemp products under the 2018 Farm Bill. Although the plaintiff therein ultimately failed to prove the legality of

the specific products she consumed based upon her failure to offer evidence of their delta-9 THC concentration, this Court did not accept the proposition that DEA's interpretation categorically rendered those hemp-derived cannabinoids unlawful. *Anderson* accordingly represents the law of this Circuit.

48. Instead, this Court rejected the argument that DEA's interim final rule and subsequent opinion letter required a finding that hemp-derived THC-O was illegal. The Court relied on the Farm Bill's text and the Ninth Circuit's reasoning in *AK Futures LLC v. Boyd Street Distro, LLC*, recognizing that the legality of hemp-derived cannabinoid products turns on whether they fall within the statutory definition of hemp, including whether they contain not more than 0.3 percent delta-9 THC on a dry-weight basis. *Anderson* therefore confirms that DEA cannot displace Congress's hemp definition through an agency interpretation that treats hemp-derived cannabinoids as Schedule I controlled substances merely because they undergo post-harvest processing or conversion.

49. That reasoning applies with particular force here. The Petitioner's HHC products are made from lawful hemp-derived inputs

and are supported by product-specific documentation demonstrating compliance with the Farm Bill's delta-9 THC threshold. Unlike the plaintiff in *Anderson*, the Petitioner can provide the very evidence this Court found missing there: product-specific proof of hemp derivation and delta-9 THC concentration. Accordingly, *Anderson* supports the Petitioner's position that the Challenged Action conflicts with the Farm Bill's plain text and exceeds DEA's authority.

## B. THE DEA EXCEEDED ITS STATUTORY AUTHORITY IN ISSUING THE CHALLENGED ACTION.

50. Congress, not executive agencies like the DEA, defines the scope of federal criminal liability.

51. The DEA lacks authority to narrow Congress's legalization of hemp cannabinoids through interpretive construction unsupported by statutory text.

52. The Challenged Action unlawfully expands the scope of criminal liability under the CSA without clear congressional authorization, as is required.

53. Congress did not clearly authorize the DEA to criminalize broad categories of hemp-derived cannabinoids through administrative interpretation.

14

54.    The Challenged Action therefore exceeds the DEA's statutory authority and is *ultra vires.*

### C. THE CHALLENGED ACTION VIOLATES THE ADMINISTRATIVE PROCEDURES ACT AS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW.

55.    Courts should "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Casa de Md., Inc. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684 (4th Cir. 2019)(quoting 5 U.S.C. § 706(2)(A)). "[A] reviewing court may not "speculate on reasons that might have supported" a change in agency position, *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 299 (4th Cir. 2018), nor "supply a reasoned basis for the agency's action that the agency itself has not given," *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U. S. 29, 43 (1983)(citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). An agency's failure to explain its decision to disregard facts that underlay the prior policy is arbitrary and capricious. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 547-49 (2009).

56.    The DEA failed to reasonably explain why hemp-derived HHC falls outside the protections established by the 2018 Farm Bill. *See id.*

This failure is critical given this Court's findings in *Anderson, supra.*, which represents the law of this Circuit.

57. The DEA failed to adequately consider congressional intent, industry reliance interests, ordinary hemp-processing realities, and the practical consequences of the Challenged Action. This failure is critical given this Court's findings in *Anderson, supra.*

58. The DEA failed to engage in reasoned decision-making and instead, relied upon conclusory assumptions concerning "synthetic" cannabinoids, without adequately defining the term or explaining its statutory basis. This failure is critical given this Court's findings in *Anderson, supra.*

59. The DEA additionally failed to sufficiently analyze HHC's distinct scientific, pharmacological, and abuse-potential characteristics prior to adopting the challenged interpretation, and relatedly, failed to explain its rationale for disregarding facts upon which the prior policy is based. *See Fox*, 556 U.S. at 547-49.

60. The Challenged Action is therefore arbitrary, capricious, contrary to law, and must be set aside pursuant to the Administrative Procedure Act.

16

### D. THE DEA'S INTERPRETATION IN THE CHALLENGED ACTION VIOLATES THE MAJOR QUESTIONS DOCTRINE.

61. The major questions doctrine applies if the DEA seeks to resolve a matter of great political significance or regulate a significant portion of the American economy. *Capt. Gaston*, 76 F.4th at 299; *West Virginia*, 597 U.S. at 743-44.

62. Here, the Challenged Action carries enormous economic and political significance affecting a nationwide hemp industry involving billions of dollars in commerce, ancillary to the cannabis industry, which is also experiencing the first major changes to Federal law to have occurred in 56 years.

63. The DEA's interpretation threatens substantial criminal, regulatory, and economic consequences for manufacturers, retailers, distributors, laboratories, transporters, financial institutions, and consumers operating in reliance upon federal law.

64. If Congress intended to criminalize broad categories of hemp-derived cannabinoids produced through ordinary commercial processing methods, the DEA must point to clear congressional authorization for the power to impose the Challenged Action. *West Virginia*, 597 U.S. at 723.

17

65. Because Congress did not clearly delegate such authority to the DEA, the interpretation effectuated by the Challenged Action violates the major questions doctrine.

**E. THIS COURT OWES NO JUDICIAL DEFERENCE TO THE DEA'S INTERPRETATION.**

66. Courts owe no deference to agency interpretations expanding criminal liability. *See Loper Bright*.

67. Whether hemp-derived HHC falls within the protections established by Congress presents a question of statutory interpretation reserved for the judiciary.

68. Agencies are not entitled to expand criminal statutes through administrative construction.

69. To the extent any ambiguity exists concerning the scope of the CSA or the 2018 Farm Bill, such ambiguity must be construed narrowly rather than expansively in favor of criminalization.

70. The DEA's interpretation in the Challenged Action expanded criminal liability to millions of parties lawfully operating their businesses consistent with the 2018 Farm Bill and is therefore entitled to no judicial deference. *See Loper Bright*.

**F.  STAY PENDING REVIEW AND IMPRACTICABILITY OF SEEKING A STAY FIRST FROM THE AGENCY.**

71.    A party seeking a stay of a DEA order pending review must ordinarily move first before the DEA unless moving first before the DEA would be impracticable, or where the DEA has denied or failed to afford the relief requested. Fed. R. App. P. 18(a)(1)-(2).

72.    Proceeding first before the DEA is impracticable because judicial review of the Challenged Action must be sought within thirty days under 21 U.S.C. § 877, and that deadline runs from the DEA's action — or May 4, 2026 — and not from the conclusion of any later agency proceeding. The thirty-day period is jurisdictional and cannot be enlarged.

73.    A petition to the DEA under 5 U.S.C. § 553(e) to repeal or amend the Challenged Action, or a request that the DEA stay its own rule, is subject to no fixed decisional deadline. The DEA may take months or years to act (if it acts at all), while the Petitioner continue to experience irreparable harm; and nothing in the CSA or the DEA's regulations obligates the DEA to rule within the thirty-day window available for judicial review.

19

74. Requiring Petitioner to pursue such a DEA process before seeking a stay would therefore force an untenable choice: either allow the thirty-day period for judicial review to lapse (forfeiting this Court's jurisdiction); or file the Petition within the deadline while the requested relief sits unaddressed before the DEA. A parallel § 553(e) petition cannot be initiated, briefed, and decided by the DEA within the time the statute allows.

75. Upon the date that the DEA issued the Challenged Action, the resulting harm was immediately experienced by Petitioner and remains ongoing. The Challenged Action took effect upon publication, without any thirty-day delayed effective date, so the injuries asserted herein — reclassification of Petitioner's products as Schedule I controlled substances, exposure to Section 280E, loss of banking and merchant processing, and threats to Petitioner' survival as going concerns — are accruing now and would continue throughout any DEA proceeding.

76. Further, recourse to the DEA would also be futile because the DEA has already determined, and formally codified, that HHC is a Schedule I controlled substance, and has characterized that determination as a mere technical confirmation of existing law —

20

depriving Petitioner of the normal rights and protections in connection with the Challenged Action. There is no realistic prospect that the same agency would stay or reverse that position within the time available, and Rule 18 does not require such a futile gesture as a precondition to judicial relief. Rather, it specifically provides a carve-out for emergencies such as these.

77.    As proceeding first before the DEA is both impracticable and futile, Petitioner are entitled, under Rule 18(a)(2)(A), to seek a stay directly from this Court, and will do so by separate motion addressing the factors governing a stay pending review. *Nken v. Holder*, 556 U.S. 418 (2009).

## PRAYER FOR RELIEF

WHEREFORE,    for    the    reasons    stated    herein,    the Petitioner respectfully requests that this Court:

a. Accept jurisdiction over this Petition for Review of Final Agency Action;

b. Declare unlawful the DEA's Challenged Action treating hemp-derived HHC as a Schedule I controlled substance;

c. Hold unlawful and set aside the Challenged Action pursuant to 5 U.S.C. § 706;

d. Vacate the addition of 21 C.F.R. § 1308.11(d)(115) and DEA Code Number 7220;

21

e. Vacate the DEA's Challenged Action and interpretive determination concerning HHC;

f. Issue all appropriate declaratory and injunctive relief authorized by law;

g. Stay the effective date of the Challenged Action pending review, by separate Motion for Stay of the Final Rule Pending Review, enclosed herewith (as <u>Exhibit A</u>).

h. Award Petitioner costs and attorneys' fees where authorized;

i. Grant this Petition and set aside the Challenged Action; and

j. Grant all additional relief to which Petitioner may be justly entitled.

Dated: June 1, 2026

Respectfully submitted,

*/s/ J. Gregory Troutman*

J. GREGORY TROUTMAN
TROUTMAN LAW OFFICE, PLLC
4205 Springhurst Blvd., Suite 201
Louisville, KY 40241
(502) 412-9179
jgattty@yahoo.com

DAVID K. SERGI
(*pro hac vice* pending)
SERGI & ASSOCIATES, P.C.
329 S. Guadalupe
San Marcos, TX 78666
(512) 392-5010
david@sergilaw.com
*Co-counsel for Petitioner*

22

## CERTIFICATE OF INTERESTED PERSONS
### No. 26-____
### Bluestar Operations, LLC. v. DEA, *et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.    Bluestar Operations, LLC. (Petitioner)

2.    J. Gregory Troutman (counsel for Petitioner)

3.    David K. Sergei (co-counsel for Petition)

4.    U.S. Drug Enforcement Administration (Respondent)

5.    Terrance C. Cole, Administrator, U.S. Drug Enforcement Administration

6.    Hon. Todd Blanche, Acting United States Attorney General (Respondent)

Petitioner does not have any parent corporation or any publicly held corporation that owns 10% or more of its stock.

/s/ J. Gregory Troutman
J. GREGORY TROUTMAN

CERTIFICATE OF SERVICE

Pursuant to FED. R. APP. P. 25(d), I hereby certify that on June 1, 2026, I filed the foregoing Petition for Review via the Court's ECF filing system. I further certify that I will cause one copy to be served on the following by mail, electronic mail or hand-delivery to:

Hon. Todd Blanche
Acting Attorney General of the United States
United States Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530-0001

Terrance C. Cole, Administrator
U.S. Drug Enforcement Administration
8701 Morrissette Drive
Springfield, VA 22152

/s/ J. Gregory Troutman
J. GREGORY TROUTMAN

24

# <u>EXHIBIT 1</u>

affecting the human environment.'' 16 CFR 1021.5(c)(2). This rule falls within the categorical exclusion, so no environmental assessment or environmental impact statement is required.

## X. Preemption

Section 26(a) of the CPSA provides that where a consumer product safety standard is in effect and applies to a product, no state or political subdivision of a state may either establish or continue in effect a requirement dealing with the same risk of injury unless the state requirement is identical to the Federal standard. 15 U.S.C. 2075(a). Section 26(c) of the CPSA also provides that states or political subdivisions of states may apply to CPSC for an exemption from this preemption under certain circumstances. Section 104(b) of the CPSIA deems rules issued under that provision ''consumer product safety standards.'' Therefore, once a rule issued under section 104 of the CPSIA takes effect, it will preempt in accordance with section 26(a) of the CPSA.

## XI. Effective Date

Under the procedure set forth in section 104(b)(4)(B) of the CPSIA, when a voluntary standards organization revises a standard that the Commission adopted as a mandatory standard, the revision becomes the CPSC standard 180 days after notification to the Commission, unless the Commission determines that the revision does not improve the safety of the product, or the Commission sets a later date in the **Federal Register**. 15 U.S.C. 2056a(b)(4)(B). The Commission is not taking either of those actions with respect to the revised standard for full-size baby cribs. Therefore, ASTM F1169–25 automatically will take effect as a new mandatory standard for full-size baby cribs on August 1, 2026, 180 days after the Commission received notice of the revision. As a direct final rule, unless the Commission receives a significant adverse comment within 30 days of this notice, the rule will become effective on August 1, 2026, and will apply to products manufactured after the rule's effective date.

## XII. Congressional Review Act and Executive Order 12866

Pursuant to the Congressional Review Act (CRA) and Executive Order (E.O.) 12866, the Office of Management and Budget's Office of Information and Regulatory Affairs has determined that this rule does not qualify as a ''major rule,'' as defined in 5 U.S.C. 804(2), and

is not a significant regulatory action as defined under section 2(f) of E.O. 12866. To comply with the CRA, CPSC will submit the required information to each House of Congress and the Comptroller General.

## List of Subjects in 16 CFR Part 1219

Consumer protection, Imports, Incorporation by reference, Infants and children, Law enforcement, Safety.

For the reasons discussed in the preamble, the Commission amends 16 CFR chapter II as follows:

## PART 1219—SAFETY STANDARD FOR FULL-SIZE BABY CRIBS

■ 1. The authority citation for part 1219 is revised to read as follows:

**Authority:** 15 U.S.C. 2056a.

■ 2. Revise and republish § 1219.2 to read as follows:

### § 1219.2 Requirements for full-size baby cribs.

Each full-size baby crib must comply with all applicable provisions of ASTM F1169–25, *Standard Consumer Safety Specification for Full-Size Baby Cribs,* approved December 15, 2025. The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. You may obtain a copy from ASTM International, 100 Barr Harbor Drive, P.O. Box 0700, West Conshohocken, PA 19428 or at *https:// www.astm.org/READINGLIBRARY/.* You may also inspect a copy at the Office of the Secretary, U.S. Consumer Product Safety Commission, Room 820, 4330 East-West Highway, Bethesda, MD 20814, telephone 301–504–7923, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, email *fr.inspection@ nara.gov,* or go to: *https:// www.archives.gov/federal-register/cfr/ ibr-locations.html.*

**Alberta E. Mills,**

*Secretary, Consumer Product Safety Commission.*

[FR Doc. 2026–08632 Filed 5–1–26; 8:45 am]

**BILLING CODE 6355–01–P**

## DEPARTMENT OF JUSTICE

### Drug Enforcement Administration

### 21 CFR Part 1308

[Docket No. DEA–1632]

### Specific Listing for Hexahydrocannabinol, A Currently Controlled Schedule I Substance

**AGENCY:** Drug Enforcement Administration, Department of Justice.

**ACTION:** Final rule.

**SUMMARY:** The Drug Enforcement Administration (DEA) is establishing a specific listing and DEA Controlled Substances Code Number (drug code) for 6,6,9-trimethyl-3-pentyl-6a,7,8,9,10,10a-hexahydro-6*H*-benzo[*c*]chromen-1-ol (also known as hexahydrocannabinol, and HHC) in schedule I of the Controlled Substances Act (CSA). Although hexahydrocannabinol is not specifically listed in schedule I of the CSA with its own unique drug code, it is a schedule I controlled substances in the United States under drug code 7370 because it meets the definition of tetrahydrocannabinols, a schedule I hallucinogen. Therefore, DEA is simply amending the schedule I hallucinogenic substances list to separately include hexahydrocannabinol.

**DATES:** Effective May 4, 2026.

**FOR FURTHER INFORMATION CONTACT:** Dr. Terrence L. Boos, Drug and Chemical Evaluation, Diversion Control Division, Drug Enforcement Administration; Telephone: (571) 362–3249.

**SUPPLEMENTARY INFORMATION:**

#### Hexahydrocannabinol Control

Hexahydrocannabinol (also known as 6,6,9-trimethyl-3-pentyl-6a,7,8,9,10,10a-hexahydro-6*H*-benzo[*c*]chromen-1-ol, and HHC) is a synthetic substance that is structurally related to tetrahydrocannabinols. Hexahydrocannabinol is currently controlled in schedule I as a tetrahydrocannabinol.

The Agriculture Improvement Act of 2018 (AIA), Public Law 115–334, amended the CSA to remove ''tetrahydrocannabinols in hemp'' from control.[1] Importantly, the AIA defined the term ''hemp'' to mean ''the plant Cannabis *sativa L.* and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9-tetrahydrocannabinol

---

[1] *See* 21 U.S.C. 812, Schedule I(c)(17).

concentration of not more than 0.3 percent on a dry weight basis.'' [2] Thus, only tetrahydrocannabinols in or derived from the cannabis plant—not synthetic tetrahydrocannabinols—are excluded from control as ''tetrahydrocannabinols in hemp.'' To clarify further, tetrahydrocannabinols produced through chemical conversion, even when hemp derived are considered synthetically produced for purposes of the CSA, do not qualify as ''tetrahydrocannabinols in hemp'' under the AIA.

**Legal Authority**

This rule is prompted by a letter dated June 9, 2025, in which the Secretariat of the United Nations informed the United States government that hexahydrocannabinol had been added to Schedule II of the United Nations Convention on Psychotropic Substances of 1971 (1971 Convention), February 21, 1971, 32 U.S.T. 543, 1019 U.N.T.S. 175, as amended. This letter was provoked by a decision at the 68th Session of the Commission on Narcotic Drugs (CND) in March 2025 to schedule hexahydrocannabinol under Schedule II of the 1971 Convention (CND Decision 68/5). After receiving official notice of this decision, DEA sent a letter to the Department of Health and Human Services (HHS) dated October 9, 2025, outlining its intention to specifically list hexahydrocannabinol in schedule I of the Controlled Substances Act (CSA) pursuant to treaty obligations. HHS responded in a letter dated December 3, 2025, that there are no approved new drug applications or investigational new drug applications for hexahydrocannabinol. In addition, HHS concurs with the direct listing and drug code assignment of hexahydrocannabinol in the CSA.

As discussed above, hexahydrocannabinol—by meeting the definition of ''tetrahydrocannabinols'' and being synthetically produced—has been controlled in schedule I of the CSA. Therefore, all regulations and criminal sanctions applicable to schedule I substances have been and remain applicable to hexahydrocannabinol. Drugs controlled in schedule I of the CSA satisfy and exceed the required controls of Schedule II under Article 2 of the 1971 Convention.

**Effect of Action**

As previously stated, this rule does not affect the continuing status of hexahydrocannabinol as a schedule I controlled substance in any way. This

[2] 7 U.S.C. 1639*o*(1).

action, as an administrative matter, establishes a separate, specific listing for hexahydrocannabinol in schedule I of the CSA and assigns a DEA drug code for this substance. This action will allow DEA to establish an aggregate production quota and grant individual manufacturing and procurement quotas to DEA-registered manufacturers of hexahydrocannabinol, who had previously been granted individual quotas for such purposes under the drug code for tetrahydrocannabinols.

**Regulatory Analyses**

*Administrative Procedure Act*

An agency may find good cause to exempt a rule from certain provisions of the Administrative Procedure Act (APA), including notice of proposed rulemaking and the opportunity for public comment, if it is determined to be unnecessary, impracticable, or contrary to the public interest.[3]

Pursuant to 5 U.S.C. 553(b)(B), DEA finds that notice-and-comment rulemaking is unnecessary as hexahydrocannabinol is currently controlled in schedule I as it meets the definition of tetrahydrocannabinols. The addition of a separate listing for hexahydrocannabinol and its DEA drug code number in the list of schedule I substances in 21 CFR 1308.11(d) makes no substantive difference in the status of this drug as a schedule I controlled substance, but instead is ''a minor or merely technical amendment in which the public is not particularly interested.'' [4] This rule is a ''technical amendment'' to 21 CFR 1308.11(d) as it is ''insignificant in nature and impact, and inconsequential to the industry and public.'' Therefore, DEA finds that publishing a notice of proposed rulemaking and soliciting public comment are unnecessary and good cause exists to dispense with these procedures.

In addition, DEA is concerned that delaying the effective date of this rule potentially could cause confusion regarding the regulatory status of hexahydrocannabinol. With hexahydrocannabinol currently controlled as a schedule I controlled substance, and with no additional requirements being imposed through

[3] 5 U.S.C. 553(b)(B).

[4] *National Nutritional Foods Ass'n* v. *Kennedy,* 572 F.2d 377, 385 (2d Cir. 1978) (quoting S. Rep. No. 79–752, at 200 (1945)). *See also Utility Solid Waste Activities Group* v. *E.P.A.,* 236 F.3d 749, 755 (D.C. Cir. 2001) (the ''unnecessary'' prong ''is confined to those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and public'') (internal quotations and citation omitted).

this action, DEA finds good cause exists to make this rule effective immediately upon publication in accordance with 5 U.S.C. 553(d)(3).

*Executive Orders 12866, 13563, 14192, and 14294 (Regulatory Review)*

This regulation has been drafted and reviewed in accordance with the principles of Executive Orders (E.O.) 12866 and 13563. The Office of Information and Regulatory Affairs has determined that this rule is not a significant regulatory action under section 3(f) of E.O. 12866. Hexahydrocannabinol is already a controlled substance in the United States under schedule I as a tetrahydrocannabinol. In this final rule, DEA is making an administrative change by amending its regulations to separately list hexahydrocannabinol in schedule I and to assign a DEA controlled substances code number to this substance. Separately listing hexahydrocannabinol and its DEA drug code will not alter the status of this substance as a schedule I controlled substance. Accordingly, this rule has not been reviewed by the Office of Management and Budget (OMB). DEA scheduling actions are not subject to either E.O. 14192, Unleashing Prosperity Through Deregulation, or E.O. 14294, Fighting Overcriminalization in Federal Regulations.

*Executive Order 12988, Civil Justice Reform*

This regulation meets the applicable standards set forth in sections 3(a) and 3(b)(2) of E.O. 12988 to eliminate drafting errors and ambiguity, provide a clear legal standard for affected conduct, and promote simplification and burden reduction.

*Executive Order 13132, Federalism*

This rulemaking does not have federalism implications warranting the application of E.O. 13132. The rule does not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*Executive Order 13175, Consultation and Coordination With Indian Tribal Governments*

This rule does not have Tribal implications warranting the application of E.O. 13175. It does not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal government and Indian tribes, or on the distribution of

power and responsibilities between the Federal government and Indian tribes.

*Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) applies to rules that are subject to the notice-and-comment requirements under the APA or other laws.[5] As noted in the above section regarding the applicability of the APA, DEA determined that there was good cause to exempt this final rule from notice and comment. Consequently, the RFA does not apply.

*Paperwork Reduction Act of 1995*

This action does not impose a new collection of information requirement under the Paperwork Reduction Act of 1995.[6] This action would not impose recordkeeping or reporting requirements on State or local governments, individuals, businesses, or organizations. An agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number.

*Unfunded Mandates Reform Act of 1995*

In accordance with the Unfunded Mandates Reform Act (UMRA) of 1995, 2 U.S.C. 1532, DEA has determined that this action would not result in any Federal mandate that may result ''in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any 1 year. . . .'' Therefore, neither a Small Government Agency Plan nor any other action is required under UMRA of 1995.

*Congressional Review Act*

The Office of Information and Regulatory Affairs has determined that this rule is not a major rule as defined by the Congressional Review Act (CRA), 5 U.S.C. 804. However, pursuant to the CRA, DEA is submitting a copy of this rule to both Houses of Congress and to the Comptroller General.

**List of Subjects in 21 CFR Part 1308**

Administrative practice and procedure, Drug traffic control, Reporting and recordkeeping requirements.

For the reasons set out above, DEA amends 21 CFR part 1308 as follows:

**PART 1308—SCHEDULES OF CONTROLLED SUBSTANCES**

■ 1. The authority citation for part 1308 continues to read as follows:

**Authority:** 21 U.S.C. 811, 812, 871(b), 956(b), unless otherwise noted.

■ 2. Amend § 1308.11 by adding paragraph (d)(115) to read as follows:

**§ 1308.11   Schedule I.**

\*     \*     \*     \*     \*

(d) \* \* \*

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |
| (115) 6,6,9-trimethyl-3-pentyl-6a,7,8,9,10,10a-hexahydro-6*H*-benzo[*c*]chromen-1-ol (other names: hexahydrocannabinol, HHC) ... | | | | | | 7220 |
| \* | \* | \* | \* | \* | \* | \* |

\*     \*     \*     \*     \*

**Signing Authority**

This document of the Drug Enforcement Administration was signed on April 22, 2026, by DEA Administrator Terrance C. Cole. That document with the original signature and date is maintained by DEA. For administrative purposes only, and in compliance with requirements of the Office of the Federal Register, the undersigned DEA Federal Register Liaison Officer has been authorized to sign and submit the document in electronic format for publication, as an official document of DEA. This administrative process in no way alters the legal effect of this document upon publication in the **Federal Register**.

**Heather Achbach,**

*Federal Register Liaison Officer, Drug Enforcement Administration.*

[FR Doc. 2026–08595 Filed 5–1–26; 8:45 am]

**BILLING CODE 4410–09–P**

---

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 1**

**[TD 10046]**

**RIN 1545–BL61**

**Treatment of Income From Indian Fishing Rights-Related Activity as Compensation**

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Final Regulations.

**SUMMARY:** This document contains final regulations providing that amounts paid to a member of an Indian Tribe as remuneration for services performed in a fishing rights-related activity may be treated as compensation for purposes of applying the limits on qualified retirement plan benefits and contributions. These regulations affect participants, beneficiaries, sponsors, and administrators of Tribal plans.

**DATES:**

*Effective Date:* These regulations are effective on May 4, 2026.

*Applicability Date:* For date of applicability, see § 1.415(a)–1(g)(5).

**FOR FURTHER INFORMATION CONTACT:** Jamie Dvoretzky at (202) 317–4102, or Pamela Kinard at (202) 317–6000 (not toll-free numbers).

**SUPPLEMENTARY INFORMATION:**

**Authority**

This Treasury Decision contains final regulations that amend the Income Tax Regulations (26 CFR part 1) under section 415, related to the definition of the term ''compensation'' for purposes of contribution and benefit limits applicable to qualified retirement plans. These final regulations are issued under the authority granted by section 415(j) of the Internal Revenue Code (Code), which authorizes the Secretary of the Treasury or his delegate (Secretary) to prescribe such regulations as may be necessary to carry out the purposes of section 415. These final regulations are also issued under the authority granted by section 7805(a), which authorizes the Secretary to prescribe all needful rules and regulations for the enforcement of the Code.

**Background**

This document contains amendments to regulations under section 415 of the Code, which generally imposes limitations on the annual amount that a qualified retirement plan may provide, with respect to a participant, in either benefit payments or in contributions

---

[5] 5 U.S.C. 601–612.

[6] 44 U.S.C. 3501–3521.